IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

        v.                                    Criminal No. 3:24cr183 (DJN)

MONTRIO SANTOS NEVILLE,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Montrio Santos Neville's ("Defendant") Motion to Suppress (ECF No. 15 ("Motion" or "Mot.")), moving the Court to suppress all evidence obtained during his encounter with law enforcement on October 9, 2024, that ultimately resulted in his arrest. The United States of America (the "Government") responded in opposition to Defendant's Motion (ECF No. 18 ("Opposition" or "Oppo.")), and Defendant replied (ECF No. 19 ("Reply")). On July 30, 2025, the Court held an evidentiary hearing on Defendant's Motion. (ECF No. 24; ECF No. 25 ("Hr'g Tr.").) Following the hearing, the parties provided supplemental briefing (ECF Nos. 26–27, 29), and the Motion now stands ripe for judicial review. For the reasons set forth below, the Court will DENY Defendant's Motion (ECF No. 15).

## I.    BACKGROUND

### A.    Procedural History

On December 17, 2024, the grand jury returned a two-count indictment (the "Indictment") against Defendant. (ECF No. 1.) The Indictment charges Defendant with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), and Possession with the Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1)

and (b)(1)(C).  (*Id.*)

On May 29, 2025, Defendant filed the instant Motion.  (ECF No. 15).  There, Defendant argued that the evidence supporting his Indictment must be suppressed, because police obtained it through an unconstitutional seizure that violated his Fourth Amendment rights.[1]  (*Id.* at 1.)

The Court subsequently held an evidentiary hearing for Defendant's Motion on July 30, 2025.  (ECF No. 24.)  The Court heard testimony from two Government witnesses:  Detective Sandy Ledbetter-Clarkson with the Richmond City Police Department's ("RPD") fugitive unit, and Dale Radcliff with the Chesterfield Sherriff's Office.  Both witnesses work as Task Force Officers ("TFOs") with the United States Marshal Service.  (Hr'g Tr. at 5:10–14; 25:8–10.)  The Government also introduced two exhibits:  a screenshot from a camera feed showing Defendant's associate, Carl Michael Skinner-Torres, (Gov't Ex. 1); and a screenshot of a chat message shared among Detective Ledbetter-Clarkson's team.  (Gov't Ex. 2.)  During his cross-examination of Detective Ledbtter-Clarkson, defense counsel introduced into evidence Detective Ledbetter-Clarkson's body-worn camera ("BWC") footage.  (Def. Ex. 1.)  Defendant called no witnesses of his own.

Following the presentation of evidence, the Court took Defendant's Motion under advisement and set a supplemental briefing schedule to address any additional issues that Defendant wished to raise.  (Hr'g. Tr. at 32:10–33:11; ECF No. 23.)  Defendant submitted a supplemental brief on August 12, 2025, (ECF No. 26 ("Supp. Brief")), and the Government provided a response on August 19, 2025.  (ECF No. 27 ("Supplemental Response" or "Supp.

---

[1]     Defendant also filed a separate motion to suppress statements that he made during an October 24, 2024 post-release supervision violation hearing, arguing that those statements were obtained in violation of his *Miranda* rights.  (ECF No. 16 ("*Miranda* Motion").)  Based on the Government's representation that it will not seek to introduce or use any of these statements at trial, (ECF No. 17 at 1), the Court denied Defendant's *Miranda* Motion as moot.  (ECF No. 21.)

Resp.").) Defendant replied on August 26, 2025, (ECF No. 29 ("Supplemental Reply" or "Supp.

Reply")), rendering his Motion ripe for judicial review.

After hearing Detective Ledbetter-Clarkson and TFO Radcliff's testimony and

considering the evidence admitted during the hearing, the Court finds both Detective Ledbetter-

Clarkson and TFO Radcliff's testimony credible. Based on their testimony, the evidence

presented, and the submissions of the parties, the Court makes the following findings of fact.

### B.    Findings of Fact

1. On October 9, 2024, members of the U.S. Marshals Fugitive Task Force sought to locate Carl Michael Skinner-Torres, who was wanted on an active arrest warrant in conjunction with a charge of malicious wounding. (Hr'g Tr. 5:21–6:10; 8:5–7; 27:14.) Detective Ledbetter-Clarkson had received information that Skinner-Torres was currently present in the Gilpin Court public housing development in Richmond. (*Id.* 6:11–22.) She and her team planned to arrest Skinner-Torres that afternoon. (*Id.* 12:19–22.)

2. Gilpin Court is well known as one of the most dangerous locations in Richmond, with a history of violent crime, including murders and shootings. (*Id.* 6:23–7:1; 9:6–9.) RPD has access to live feeds from so-called Tsunami Cameras, placed throughout Gilpin Court, that permit RPD to observe the public areas of the housing project as part of its violence mitigation efforts. (*Id.* 8:14–19; 9:16–20.)

3. That afternoon, an RPD detective sent Detective Ledbetter-Clarkson a screenshot from one of the Gilpin Court Tsunami Camera feeds, which depicted Skinner-Torres sitting in a chair in Gilpin Court. (*Id.* 9:20–10:3; Gov't Ex. 1.) The RPD detective informed Detective Ledbetter-Clarkson that Skinner-Torres was with Marcus and Demontray Red, that they were "shooters" and that the officers should be careful. (Hr'g Tr. 12:10–13.)

4. Upon receiving the screenshot image, Detective Ledbetter-Clarkson shared it with members of her team through a group chat. (*Id.* 10:4–15; Gov't Ex. 2.) She also shared with her team the information that she had received about Skinner-Torres's companions at the time, and that they were "shooters." (Hr'g Tr. 12:10–13; Gov't Ex. 2.)

5. Detective Ledbetter-Clarkson, TFO Radcliff and the rest of their team subsequently gathered near Skinner-Torres's suspected whereabouts in Gilpin Court and developed a plan for arresting him. (Hr'g Tr. 12:23–13:4.) As the team moved to the scene, Detective Ledbetter-Clarkson received additional information from the RPD detective observing the Gilpin Court cameras, including that Mr. Skinner-Torres was now walking away with an individual in a yellow shirt — later identified as Defendant Neville — and that the detective believed that she recognized this companion and that he could "possibly be armed." (*Id.* 13:17–24.) Detective Ledbetter-Clarkson relayed this information to her

3

team members by radio as they approached the scene. (*Id.* 13:12–24.) At this time, other citizens remained present and around in the Gilpin Court housing community. (*Id.* 29:11–12.)

6. The fugitive team designated an alley between two buildings as the place where it could most safely effectuate Skinner-Torres's arrest, since "there were no others around" in that area. (*Id.* 14:11–20.) The team began approaching that location from different directions to ultimately trap Skinner-Torres. (*Id.* 14:4–6; 28:18–20.)

7. Throughout the planning and execution of this action, Detective Ledbetter-Clarkson and TFO Radcliff remained concerned that the planned arrest could become dangerous, both for the Task Force team and for members of the community. (*Id.* 15:10–16; 28:3–8; 29:6–16.)

8. Once Skinner-Torres and Defendant Neville entered the designated alley and passed members of the law enforcement team, TFO Radcliff approached the two men and called out Skinner-Torres's name. (*Id.* 28:21–24.) Skinner-Torres looked at TFO Radcliff, then started to turn as if to run, and then took his jacket off. (*Id.* 28:24–25.) After TFO Radcliff yelled at him to "get on the ground," both Skinner-Torres and Defendant complied, laying down and facing the ground. (*Id.* 29:1–2; 29:17–30:1; 30:5–7.)

9. At that point, other members of the team approached Skinner-Torres and Defendant to effectuate Skinner-Torres's arrest. (*Id.* 16:7–10; 16:20–22; 30:2–11.) Detective Ledbetter-Clarkson approached Defendant Neville, whose identity remained unknown to her at this time. (*Id.* 16:16–19.) When she asked him for identification, Defendant Neville took off his sunglasses and responded, "Do I need ID?" before repeating his question and laughing. (Def. Ex. 1 at 00:40–00:50; Hr'g Tr. 17:1–4; 18:10–14.) Detective Ledbetter-Clarkson recognized Defendant Neville, whom she had known since before her 29-year career as a police officer. (Hr'g Tr. 18:15–23.) During her career, she had sought Defendant on outstanding warrants for various crimes (including murder as well as firearms and narcotics offenses), and she knew him to be a convicted felon. (*Id.* at 18:23–19:6; 20:11.)

10. Detective Ledbetter-Clarkson patted Defendant's pants and rolled him over, at which point she realized that he had a firearm in his waistband. (Def. Ex. 1 at 00:40–01:00; Hr'g Tr. 19:16–18.)

11. Upon discovery of his firearm, Detective Ledbetter-Clarkson arrested Defendant, took his weapon, handed it to TFO Radcliff and began searching Defendant's pockets. (Hr'g Tr. 20:18–22.) Detective Ledbetter-Clarkson recovered various objects from Defendant's front pocket, including two plastic bags containing a powdered substance and pills, respectively. (*Id.* 20:25–21:2; Def Ex. 1 at 01:20–01:31.)

4

## II.   ANALYSIS

Defendant moves to suppress the firearm and narcotics evidence obtained by police following his arrest.  Defendant centrally contends that his seizure by Task Force Officers, which occurred when TFO Radcliff yelled at the two men to get on the ground,[2] was unreasonable, because the Task Force Officers lacked reasonable suspicion that Defendant had committed a crime.  (Mot. at 5.)  As Defendant points out, he was not the subject of an arrest warrant and demonstrated no conduct on October 9, 2024, that suggested his involvement in any criminal activity.  (*Id.*)  In Defendant's telling, the officers lacked any reasonable basis to suspect that he was armed or dangerous, since they did not know who he was at the time that he was seized.  (Supp. Brief at 5.)  Defendant maintains that certain factors cited by the Government, such as Defendant's presence in a high-crime area, the officers' belief that he was possibly armed and his proximity to Skinner-Torres (who was wanted for a violent crime), all fail to support a reasonable suspicion that Defendant himself was engaging in criminal activity.  (Reply at 3–5.)  In particular, Defendant maintains that any claim of reasonable suspicion based on his proximity to a wanted suspect constitutes "guilt by association," which Supreme Court and Fourth Circuit precedent expressly forbids.  (Mot. at 5–6 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *United States v. Di Re*, 332 U.S. 581, 583–87 (1948); *United States v. Black*, 707 F.3d 531, 538–39 (4th Cir. 2013)).)

Although the Government concedes that Defendant was seized for Fourth Amendment purposes, it argues that this seizure was reasonable — and thus lawful — under two rationales.  First, the Government contends that officers possessed reasonable suspicion that Defendant was

---

[2]    The Government concedes that Defendant was seized, for Fourth Amendment purposes, as a result of that command.  (Resp. at 4.)

armed and dangerous, and thus, under *Terry v. Ohio*, 392 U.S. 1 (1968), his seizure was lawful.[3] (Oppo. at 6.) In support, the Government points to the fact that the officers were acting on information that Defendant was a "shooter," and that this information, along with Defendant's "presence with Skinner-Torres," established reasonable suspicion sufficient to render Defendant's seizure lawful. (*Id.*)

Second, and more persuasively, the Government argues that Defendant's seizure was reasonable even absent any particularized suspicion of criminal activity, because it was necessary to ensure officer safety during Skinner-Torres's arrest. In support, the Government points to the fact that Skinner-Torres was a known violent offender and the Task Force Officers' understanding that Skinner-Torres's companion was potentially "a shooter." (Gov't Ex. 2.) The Government also submits that police "have a strong interest in securing the arrest scene, including, if necessary, the temporary detention of third persons," since bystanders to arrests "often may introduce additional variables at a time when the primary and legitimate goal of the police is to secure control of the situation." (Oppo. at 5.) For legal support, the Government turns to *Michigan v. Summers,* 452 U.S. 692 (1981), the landmark Supreme Court case that

---

[3]     The Court struggles to discern the Government's argument on the question of "reasonable suspicion." In its Opposition, the Government argues that the officers had "reasonable suspicion to believe that Defendant *may be armed and dangerous*," (Oppo. at 6 (emphasis added)), and in its Supplemental Response, it maintains that the information about Defendant being potentially armed provided officers with "reasonable suspicion *to detain*." (Supp. Resp. at 3 (emphasis added).) Yet, in both instances, the Government stops short of asserting that the officers possessed reasonable suspicion that Defendant had committed, or was then committing, a *crime*. *Cf. United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc) (a *Terry* stop "requires a reasonable suspicion that a crime or other infraction has been or is being committed"). For purposes of its analysis, the Court construes the Government to argue that reasonable suspicion of criminal conduct, on its own, justified Defendant's seizure — an argument that the Court considers, and ultimately rejects, below. *See infra* Section III.B.1. To the extent that this "suspicion" also supports the Government's broader argument that the officers acted reasonably in seizing Defendant, the Court considers that argument in a later section. *See infra* Section III.B.3.

6

categorically recognized that the "detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, [is] reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search." *Bailey v. United States*, 568 U.S. 186, 200 (2013).[4] The Government also cites several Sixth Circuit and out-of-circuit district court cases finding the detention of innocent bystanders permissible under various circumstances. (*See* Oppo. at 4–5 (collecting cases).)

In reply, Defendant summarily rejects the Government's arguments that a seizure can be reasonable absent particularized suspicion of criminal activity. As a threshold matter, Defendant argues that the *Summers* doctrine cannot apply to his case, because that doctrine allows only the seizure of occupants of the premises during the execution of search warrants for residential searches, not the seizure of bystanders during the execution of arrest warrants. (Reply at 1–3.) Defendant invokes *Bailey v. United States*, 568 U.S. 186, 201 (2013), where the Supreme Court imposed a "spatial constraint defined by the immediate vicinity of the premises to be searched" on *Summers*, and argues that this "constraint" limits the *Summers* doctrine to the search warrant context. (*Id.* at 1–2.) Defendant also asserts that none of the "search-related law enforcement interests" animating *Summers*, which he characterizes as "securing a home during a judicially authorized search, preventing flight of its occupants, and ensuring officer safety *within a confined indoor environment*," apply to his case. (*Id.* at 2 (emphasis added).) Finally, to the extent a derivative "innocent bystander doctrine" exists, Defendant argues that it also fails to apply to his case, for two reasons. First, the case law underpinning such a doctrine "most[ly]"

---

[4]     The Government highlights *Summers* "as an example of a limited intrusion on an individual's personal security based on an officer's reasonable belief that he was dealing with a possibly armed and dangerous suspect and in the interest in minimizing the risk of harm to arresting officers." (Supp. Resp. at 2.)

7

involves search warrants or the need to secure a location prior to entry, rather than the arrest warrant scenario present in his case. (*Id.*) And second, this case law predates *Bailey*, which strictly circumscribes law enforcement's ability to detain individuals in the vicinity of law enforcement operations, and which casts doubts on the continued validity of this case law. (*Id.* at 2–3.)

The Court begins with a brief overview of the relevant Fourth Amendment jurisprudence before proceeding to the merits of Defendant's arguments in favor of suppression.

### A.    Governing Law Concerning Fourth Amendment Seizures

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Thus, "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995).

"The protection against unreasonable seizures includes brief investigatory stops." *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc) (citing *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018); *Reid v. Georgia*, 448 U.S. 438, 440 (1980)). Courts typically assess the reasonableness of such investigatory seizures under the framework announced in *Terry v. Ohio*, 392 U.S. 1 (1968). Pursuant to *Terry*, such seizures "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid*, 448 U.S. at 440. Such "reasonable suspicion" must be based on facts that are "specific and particular to the individual seized." *Black*, 707 F.3d at 540. There can be "no reasonable suspicion merely by association." *Id.* at 539. In addition, knowledge of a suspect's prior criminal record does not suffice to create reasonable suspicion, even when paired with evasive behavior. *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). And while a subject's

8

presence in a high-crime area presents a relevant consideration, it does not, on its own, establish reasonable suspicion to justify a warrantless seizure. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

However, individualized suspicion is not required to render a Fourth Amendment seizure reasonable. *See Samson v. California*, 547 U.S. 843, 855 n.4 (2006) ("[W]hile this Court's jurisprudence has often recognized that to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, we have also recognized that the Fourth Amendment imposes no irreducible requirement of such suspicion.") (internal quotations omitted); *United States v. Lewis*, 674 F.3d 1298, 1305 (11th Cir. 2012) ("[I]ndividualized suspicion is not an absolute prerequisite for every constitutional search or seizure."); *Black*, 707 F.3d at 540 ("Exceptions to the individualized suspicion requirement have been upheld . . . in certain limited circumstances, where the search is justified by special needs — that is, concerns other than crime detection — and must be justified by balancing the individual's privacy expectations against the government interests.") (cleaned up).  In such cases, reasonableness serves as the relevant touchstone. *Samson*, 547 U.S. at 855 n.4 ("The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion."); *Ruttenberg v. Jones*, 283 F. App'x 121, 136 (4th Cir. 2008) ("[T]he guiding standard is whether, under the circumstances confronting the officers and disregarding their intent or motivation, their conduct was objectively reasonable.  Because context matters when making such a determination, per se rules are seldom appropriate.") (citations omitted).  In determining reasonableness, courts must "balance the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental objectives." *United States v. Watson*, 703 F.3d 684, 692–93 (4th Cir. 2013) (citing *Maryland v. Buie*, 494 U.S. 325, 331 (1990)) (cleaned up).

9

**B.     Discussion**

With these legal principles in mind, the Court turns to the merits of Defendant's arguments.  While the Court agrees with Defendant that the Task Force Officers lacked reasonable, particularized suspicion to seize him, the Court nonetheless finds Defendant's seizure reasonable for Fourth Amendment purposes, on two bases.  First, the Court finds that the principles animating the Supreme Court's *Summers* decision render that exception applicable in the instant case.  Second, the Court also finds Defendant's seizure reasonable under the Supreme Court's general balancing framework, since the important governmental interest in officer safety and the acute risk of harm to the Task Force Officers effectuating Skinner-Torres's arrest substantially outweigh the minimal intrusion on Defendant's Fourth Amendment interests.  For all of these reasons, the Court finds that Defendant's seizure was reasonable under the Fourth Amendment and will accordingly DENY Defendant's Motion (ECF No. 15).[5]

**1.     Reasonable, particularized suspicion to seize Defendant**

The Court begins by considering Defendant's argument that the officers involved in his October 9, 2024 seizure lacked reasonable, particularized suspicion to seize him.  The Government argues that the officers possessed reasonable suspicion that Defendant was engaged in criminal behavior, because of three factors:  (a) the Task Force Officers' reasonable belief that Defendant was armed and dangerous; (b) Defendant's presence in a high-crime area; and (c) Defendant's proximity to Skinner-Torres, whom officers were seeking on an active arrest warrant for a violent crime.  (Oppo. at 3–4; Supp. Resp. at 3.)

---

[5]     Defendant does not move for suppression on any other basis.  Therefore, the Court need not address the propriety of Detective Ledbetter-Clarkson's decision to pat Defendant's pants, turn him over, place him under arrest or search his pockets.  (Def. Ex. 1 at 00:52–01:51.)

Defendant has the better of this argument. The officers' purported belief that Defendant was a "shooter," and thus armed and dangerous, appears to be based only on the relaying detective's knowledge of Defendant's past behavior.[6] Under the Government's theory, anyone with a history of criminal behavior would be suspected of engaging in criminal behavior — an approach that would plainly swallow the *Terry* rule and fly in the face of Fourth Circuit precedent finding such broad-based, generalized suspicion inadequate for Fourth Amendment purposes. *Cf. Curry*, 965 F.3d at 332 (finding "limited and vague information regarding a possible crime" insufficient to justify a seizure under the Fourth Amendment); *Black*, 707 F.3d at 540 (rejecting prior arrest history as a "logical basis for a reasonable, particularized suspicion"). Similarly, the Government's heavy reliance on Defendant's proximity to a known criminal as a basis for reasonable suspicion runs afoul of Fourth Circuit and Supreme Court law concerning guilt (or suspicion) by association. *Cf. Ybarra*, 444 U.S. at 91 ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause [or reasonable suspicion] to search that person.").

*United States v. Black*, 707 F.3d 531 (4th Cir. 2013), proves instructive on these points. There, the Fourth Circuit found that even a long list of purportedly suspicious facts (the defendant's presence at a gas station in a high crime neighborhood, his association with an individual who had a prior arrest history, displays of lawfully possessed firearms and lack of local ID) stood insufficient to establish reasonable suspicion. *Id.* at 539. Here, Defendant's suspicious characteristics, including his association with a criminal and presence in a high crime

---

[6]     Nothing in the record suggests that the detective communicating information to Detective Ledbetter-Clarkson or anyone else on the Task Force actually saw Defendant handling a weapon before he was detained on October 9, 2024, or that anyone possessed any other tangible information suggesting that he was armed or dangerous *that day*.

area, are similar to those rejected by the Fourth Circuit in *Black*, yet even less developed. *Black*'s analysis thus controls here: the officers could not have had reasonable suspicion based on Defendant's suspicious characteristics alone, even when viewed in their totality. For all of these reasons, and under existing Fourth Circuit precedent, the Court finds that the Task Force Officers lacked particularized, reasonable suspicion that Defendant was participating in criminal activity on October 9, 2024.

However, the Court rejects Defendant's attempt to frame this finding as the endpoint of its inquiry. Throughout his briefing, and most explicitly in his Supplemental Reply, Defendant argues that "a stop is reasonable only if it rests on individualized, particularized suspicion tied to the person seized." (Supp. Reply at 3.) Defendant is wrong. As the Court already noted, the Supreme Court has recognized, in no uncertain terms, that "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion" and that the Fourth Amendment "imposes no irreducible requirement of such suspicion." *Samson*, 547 U.S. at 855 n.4. That holding stands reflected in the Supreme Court's recognition of at least two scenarios where individualized suspicion is categorically *not* required to render detention reasonable: for passengers of a vehicle during a traffic stop, *Maryland v. Wilson*, 519 U.S. 408 (1997), and for occupants of, or nearby bystanders to, a residence subject to a search warrant, *Summers*, 452 U.S. at 705.[7] Thus, binding precedent clearly dictates that Defendant's seizure is not per se unreasonable simply because the officers lacked particularized reasonable suspicion of Defendant's criminal activity. To determine whether such a seizure is reasonable, the Court

---

[7] The Fourth Circuit has similarly recognized that "[e]xceptions to the individualized suspicion requirement have been upheld . . . in certain limited circumstances, where the search is justified by special needs — that is, concerns other than crime detection." *Black*, 707 F.3d at 540 (cleaned up).

must look beyond reasonable suspicion to the case law and the facts at hand, both of which undermine Defendant's argument.

### 2.    Reasonableness of Defendant's Seizure under *Summers*

The Court turns to whether the *Summers* doctrine provides a basis for finding Defendant's temporary seizure reasonable for Fourth Amendment Purposes.  Upon review of the case law and the key principles animating *Summers* — including, most centrally, its imperative to protect law enforcement officers' safety — the Court finds the *Summers* exception applicable in this case.  On that basis, the Court concludes that the Task Force Officers acted reasonably in briefly detaining Defendant while executing an arrest warrant against his companion, and that, therefore, no Fourth Amendment violation occurred.

As briefly referenced above, the Supreme Court has recognized several categorical exceptions to the need for individualized reasonable suspicion in the Fourth Amendment seizure context, including, as relevant here, the so-called "*Summers* exception."  *See Summers*, 452 U.S. at 705.[8]  There, the Supreme Court recognized that the "detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion" is "reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search." *Bailey*, 568 U.S. at 200; *see Sharp v. Cnty. of Orange*, 871 F.3d 901, 913 (9th Cir. 2017) ("It is established that a warrant to search a home implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.") (citing *Summers*, 452 U.S. at 705) (internal quotation omitted).  In the Supreme Court's telling, *Summers* recognized "three important law enforcement interests that, taken together, justify the detention of an

---

[8]    The Court discusses the other such exception — for the temporary seizure of passengers in a lawfully stopped vehicle — in the next section of this Opinion. *See infra* Section III.B.3 (discussing *Maryland v. Wilson*, 519 U.S. 408 (1997)).

occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight." *Bailey*, 568 U.S. at 194 (citing *Summers*, 452 U.S. at 702–03). Concerning the first of these interests, the *Summers* Court found that, in the context of executing search warrants for narcotics, "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers*, 452 U.S. at 702–03. Such "unquestioned command of the situation" enables officers to act "without fear" that others on the premises would "become disruptive, dangerous, or otherwise frustrate" the officers' efforts. *Bailey*, 568 U.S. at 195. In revisiting *Summers* several decades later, the Court acknowledged that the exception remains "categorical," but it also limited the exception's reach to those within "the immediate vicinity of the premises to be searched." *Id.* at 199, 201. In so doing, the Court emphasized that a broader application would diminish the "search-related law enforcement interests" that justify detentions without individualized reasonable suspicion in this context. *Id.* at 201.

While courts have applied the *Summers* exception to detentions beyond the residential search warrant context, the full scope of its application remains unsettled. In situations where police officers have detained bystanders or occupants during the execution of *non-residential* search warrants, federal courts have found such suspicionless detentions reasonable under *Summers*. *See, e.g., Perez Cruz v. Barr*, 926 F.3d 1128, 1141 (9th Cir. 2019) (recognizing that the *Summers* doctrine has been applied beyond mere home searches to permit the police to "detain a building's occupants [including employees at a place of work] while officers execute a search warrant as long as the detention is reasonable.") (citing *Dawson v. City of Seattle*, 435 F.3d 1054, 1065 (9th Cir. 2006); *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003)). As to the applicability of *Summers* to the temporary detention of bystanders during the execution of *arrest*

14

warrants, the Ninth Circuit recently found that "our case law on that question, as well as rulings from several other federal circuit courts, could lead reasonable persons to different conclusions." *Sharp*, 871 F.3d at 916; *see Gomez v. United States*, 601 F. App'x 841, 847 (11th Cir. 2015) ("Whether the categorical detention exception recognized by *Summers* in a search warrant context applies with equal force to the execution of an arrest warrant is an open question in this Circuit."); *Jackson v. Zormier*, 2024 WL 4120350, at *3 (N.D. Ind. 2024) (recognizing that "federal courts have not reached a consensus on whether the categorical exception established in *Summers* extends to the execution of an arrest warrant"). While the Ninth Circuit ultimately opted against categorically extending *Summers* to arrest warrants, it recognized that "[t]here will surely be circumstances when detention of persons on, or immediately near, the premises [where an arrest warrant is executed] will be objectively reasonable" and employed the *Summers* Court's language in underscoring the need for officers to "take command of the situation to protect their own safety and the safety of others." *Sharp*, 871 F.3d at 913, 915 (citing *Summers*, 452 U.S. at 702–03).

Though the Fourth Circuit has not yet spoken clearly on whether the *Summers* exception covers the detention of bystanders during the execution of arrest warrants, it has recently signaled an openness to applying the exception beyond its traditional bounds. The overwhelming majority of Fourth Circuit cases citing *Summers* fall within the doctrine's heartland: the detention of occupants during the execution of search warrants of residential properties. *See, e.g.*, *Yanez-Marquez v. Lynch*, 789 F.3d 434 (4th Cir. 2015); *United States v. Montieth*, 662 F.3d 660 (4th Cir. 2011). However, the Fourth Circuit's most recent opinion citing *Summers* concerns a defendant's temporary detention while the police sought to execute an arrest warrant for his bedmate. *United States v. Moats*, 2021 WL 4859608 (4th Cir. 2021)

(unpublished) (per curiam). There, the court cited *Summers* in support of its finding that the district court committed "no clear error . . . in finding that the temporary detention of Moats was reasonable in the interest of officer safety." *Id.* at *2. While this unpublished case lacks persuasive authority, it signals the court's openness to applying *Summers* outside of its traditional context, while underscoring the centrality of officer safety to the doctrine more broadly.

Two doctrinal underpinnings of *Summers* and its progeny hold particular importance in the context of the instant Motion: the *Summers* Court's significant reliance on an earlier finding of probable cause by a neutral magistrate to justify the third party's detention, and the repeated emphasis on the risk of harm to officers effectuating warrants as the doctrine's core animating rationale. The *Summers* Court expressly characterized the existence of a warrant, based on "probable cause to believe that the law was being violated" as determined by a "neutral and detached magistrate," as being of "prime importance" to its reasonableness analysis. *Summers*, 452 U.S. at 701. The Fourth Circuit characterized this "prior authorization" as the very "foundation of the *Summers* holding." *Watson*, 703 F.3d at 691. This "prime importance" stands reflected in the Supreme Court's view that the previously obtained warrant, based on probable cause, "implicitly carries with it" a limited authority to detain a bystander while officers effectuate the purpose of the warrant and provides an "objective justification for the detention." *Summers*, 452 U.S. at 703, 705.

The Supreme Court has also repeatedly highlighted officer safety as a core animating principle — if not the central motivation — for the *Summers* exception. In *Summers* itself, the Court pointed expressly to the "interest in minimizing the risk of harm to the officers," which it characterized as "less obvious" than the interest in preventing flight by the detainee, "but

16

sometimes of greater importance." *Summers*, 452 U.S. at 702.   In the Court's oft-quoted view, that risk could be minimized "if the officers routinely exercise unquestioned command of the situation." *Id.* at 702–03.  Only such "unquestioned command"— which requires the detention of nearby bystanders — allows officers to operate "without fear" of others becoming "disruptive, dangerous, or otherwise frustrat[ing]" the operation in question. *Bailey*, 568 U.S. at 195 (quoting *Summers*, 452 U.S. at 703).  Exercising command of the scene proves especially important in contexts where, as in *Summers*, officers face scenarios "that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Summers*, 452 U.S. at 702.  The Supreme Court affirmed the centrality of this rationale in *Muehler v. Mena*, 544 U.S. 93 (2005), where it found that seizing and handcuffing a sleeping bystander during the execution of a search warrant was justified in large part because of the general "safety risk inherent" in the search at hand. *Id.* at 96, 100.

The Court finds that these core animating principles behind the *Summers* exception, which apply with equal force to the facts of this case, justify the finding that Defendant Neville's brief seizure was reasonable for Fourth Amendment purposes under the *Summers* exception. First, the *Summers* doctrine's recognition that officers may reasonably detain bystanders while executing warrants under dangerous circumstances unquestionably applies with full force in the instant case.  Skinner-Torres, Defendant's companion and the subject of an arrest warrant, was a known violent offender whom the police sought to arrest for crimes involving violence. (Hr'g Tr. 5:21–6:10.)  In light of that evidence alone, the officers were amply justified in perceiving a significant risk that Defendant, as Skinner-Torres's companion, could become "disruptive, dangerous, or otherwise frustrate" law enforcement during an arrest. *Bailey*, 568 U.S. at 195. This reasonable inference is further amplified by Skinner-Torres's fugitive status and the

consequences he likely faced as a result of his arrest, given the violent nature of the crime with which he had been charged. The officers' information that Defendant was possibly armed and a "shooter," along with the fact that this operation took place in one of Richmond's most dangerous areas, would only have heightened this perception of danger, further increasing the need for officers to exercise "unquestioned command of the situation," for their own safety's sake. *Summers*, 452 U.S. at 703. Given these facts, the *Summers* exception's animating principle of protecting officer safety as they execute warrants under dangerous circumstances strongly supports a finding that the exception should apply to Defendant, rendering his detention categorically reasonable, and thus lawful, under the Fourth Amendment.

*Summers'* emphasis on the existence of a duly authorized warrant, and the implicit grant of authority to detain other people in conjunction with the execution of that warrant, also applies with equal force to the case at hand. Here, much like in *Summers*, a neutral Magistrate found probable cause for an infraction (Skinner-Torres's probation violation) and authorized the police to take action on that information (via an arrest warrant). In so doing, that Magistrate granted the executing officers the authority to do what was necessary to lawfully arrest Skinner-Torres, which reasonably includes a "limited authority to detain" nearby persons while properly (and safely) effectuating the warrant. *Summers*, 452 U.S. at 705. This rationale, which the *Summers* Court found of "prime importance," and its self-evident importance in the case at hand thus lends further support to the *Summers* exception's applicability to Defendant's case and a finding that Defendant's detention was lawful under that exception. *Id.* at 701.

The Court's finding that the *Summer* exception applies to Defendant's seizure stands further supported by a growing body of caselaw arriving at the same view under similar factual circumstances. Significantly, the Sixth, Ninth, Tenth and Eleventh Circuits have all read

Supreme Court precedent as permitting the application of *Summers* beyond its residential-search-warrant context to the temporary detention of bystanders during the execution of arrest warrants. The Eleventh Circuit, in *Gomez v. United States*, 601 F. App'x 841, 847 (11th Cir. 2015), upheld the temporary detention of plaintiff Gomez outside his residence, while police executed an arrest warrant for Gomez's father inside the residence, as both lawful and reasonable. In that opinion, the court provided a thorough discussion of *Summers* and its applicability beyond the search warrant context, before finding that the officer in question "lawfully and reasonably directed and controlled the movement of [the defendant] in conjunction with the safe and efficient execution of the arrest warrant," invoking both *Summers*' language and its animating principles in arriving at this conclusion.[9] *Id.* at 849. Similarly, in *United States v. Enslin*, 327 F.3d 788 (9th Cir. 2003), the Ninth Circuit considered the lawfulness of a police order for defendant to "show his hands" while U.S. Marshals executed an arrest warrant against another person in the same house. *Id.* at 791. After finding that the "show hands order" constituted a Fourth Amendment seizure, the court found that this seizure was not unreasonable, given the "substantial and important interest in preserving officer safety." *Id.* at 798. The Court cited *Summers* for this proposition, noting that "[a]lthough *Summers* involved a search pursuant to a search warrant rather than a consent search to execute an arrest warrant, much of the analysis remains applicable." *Id.* at 797 n.32. The Sixth and Tenth Circuits applied similar logic in cases beyond *Summers'* express

---

[9]    While the Eleventh Circuit stopped short of categorically applying the *Summers* Exception to all arrest warrant cases, it noted approvingly that "this Court has already cited and applied *Summers* to some extent to analyze what a police officer may lawfully do at the scene vis-à-vis detaining and controlling an innocent passenger during a traffic stop of a vehicle or a bystander on the sidewalk watching a fight," citing *Hudson v. Hall*, 231 F.3d 1289, 1292 (11th Cir. 2000), and *United States v. Clark*, 337 F.3d 1282, 1283 (11th Cir. 2003). *Gomez*, 601 F. App'x at 848.

scope and arrived at similar conclusions. *See Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (stating, in dictum, that "the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search *or arrest warrant*," and citing *Summers* for support) (emphasis added); *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004) ("Because the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals that are located during the search, we conclude that detaining potentially dangerous persons for the duration of the arrest qualifies as a reasonable step to ensure the officers' safety.") (cleaned up).[10]

Defendant argues that his seizure cannot be justified under the *Summers* doctrine, which he defines narrowly as applying "only where officers are executing a search warrant at a specific premises and seek to detain an occupant of that premises during the execution of the warrant." (Reply at 1.) Aside from the differing factual predicate, Defendant also argues that the law enforcement safety interests underpinning *Summers*, which he characterizes, in relevant part, as "ensuring officer safety *within a confined indoor environment*," do not apply here. (*Id.* at 2 (emphasis added).) Defendant appears to suggest that Skinner-Torres's arrest on a "public sidewalk . . . implicates none of the concerns" animating *Summers*, including the officer safety rationale discussed at length above. (*Id.*) Defendant also places much reliance on *Bailey*, which he reads as the Court's effort to narrow existing Fourth Amendment doctrine, and which he suggests has invalidated earlier case law from other circuits supporting the applicability of

---

[10]    While the Tenth Circuit cites *Summers* in its opinion, it relies primarily on the Supreme Court's related holding, in *Maryland v. Buie*, 494 U.S. 325 (1990), that protective sweeps during in-home arrests are constitutionally permissible. *See Maddox*, 388 F.3d at 1362 ("We hold that *Buie* applies to both protective searches and protective detentions because the Court's reasoning in *Buie* supports treating protective sweeps and protective detentions similarly.").

*Summers'* principles in other contexts, including the arrest warrant context. (Reply at 2–3; *see also* Supp. Mem. at 4 (characterizing *Bailey* as "expressly limit[ing] *Summers* to its facts").)

Defendant's arguments fail to persuade the Court. As a threshold matter, the Court disagrees with Defendant's unduly narrow characterization of the law enforcement safety interest animating *Summers*, which Defendant limits to "ensuring officer safety *within a confined indoor environment*," and which he appears to categorically discredit in the context of a "public sidewalk arrest." (Reply at 2.) Neither *Summers* nor *Bailey* support such a limited reading. As discussed before, the *Summers* Court emphasized the need to "exercise unquestioned command of the situation" to minimize the risk of harm to officers, without qualifying or limiting the nature of the "situation" in question. *Summers*, 452 U.S. at 702–03. To the extent that the Court sought to define the source of that risk, it pointed generally to scenarios "that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. Nowhere does the Court suggest that officers' need to exercise control over a situation or the risk of an individual's "sudden violence or frantic efforts" depend on the indoor or private nature of a residential search. To the extent that *Bailey* engages with this issue, that case only specifies that officers' reasonable fear of disruption or danger stems from persons "on the premises and able to observe" officers' actions. *Bailey*, 568 U.S. at 195. In declining to apply *Summers* to the facts in *Bailey,* the Supreme Court highlighted that the defendant, who "had left the premises, apparently without knowledge of the search . . . posed little risk to the officers at the scene." (*Id.* at 195–96.)

Most importantly, none of this language suggests that the officer safety interest underpinning the *Summers* doctrine should apply with any less force in the instant case. Here, Defendant clearly posed the kind of risk described by *Summers* and *Bailey*: he was directly at Skinner-Torres's side, "able to observe" his impending arrest, and could reasonably have been

expected to resort to "violence or frantic efforts," given that he was potentially armed and a "shooter." Defendants' arguments that the animating rationale behind those decisions fails to apply in his case ring hollow.

The Court also rejects Defendant's sweeping legal claims that *Bailey* (1) confined the *Summers* doctrine to its facts alone and (2) narrowed the Fourth Amendment doctrine to such a degree as to invalidate other circuits' application of *Summers* to seizures of bystanders pursuant to arrest warrants. Writing for the Court in *Bailey*, Justice Kennedy framed the specific question before the Court as "whether the seizure of the [defendant] was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search." *Bailey*, 568 U.S. at 189–90. Put more simply, "[t]he issue is whether the reasoning in *Summers* can justify detentions *beyond the immediate vicinity of the premises being searched*." *Id.* at 194 (emphasis added). In finding that it could not, the Court trained its analysis on whether the animating principles of *Summers* justified detaining occupants *beyond the vicinity* of the law enforcement operation — a question of geographic scope, and nothing more. The Court's conclusion that "it is necessary to confine the *Summers* rule to those who are present when and where the search is being conducted" similarly highlights the limited geographic question that the Court sought to address. *Id.* at 197.[11] As is evident from the opinion's text, *Bailey* in no way undermines the officer safety rationale underpinning *Summers* as applied to a lawful seizure without particularized

---

[11]    This Court notes that *Bailey* also engaged in a discussion of the degree to which such temporary detentions intrude upon personal liberty, highlighting the "additional level of intrusiveness" of a public detention relative to being detained inside one's home. *Bailey*, 568 U.S. at 200. Given this Court's primary focus on *Summers*' law enforcement rationales and how these apply to the case at hand, that additional consideration fails to meaningfully affect the Court's analysis here.

suspicion, as Defendant appears to argue.  If anything, Justice Kennedy places that rationale at the doctrine's very center, characterizing the Court's holding as limiting the *Summers* rule to "the area in which an occupant poses *a real threat to the safe and efficient execution* of a search warrant." *Id.* at 201 (emphasis added). *Bailey* therefore does nothing to undermine the argument that the *Summers* doctrine may apply in cases where bystanders "pose[] a real threat to the safe and efficient execution" of an arrest warrant, such as the Courts of Appeals cases discussed above.  And as to Defendant's case, *Bailey* only further supports the argument that *Summers* should apply here, given that Defendant was unquestionably "present when and where" the arrest was conducted and in the area where he could pose a "real threat" to the officers seeking to execute Skinner-Torres's arrest warrant.  As such, the Court rejects Defendant's arguments concerning *Bailey* and its purported narrowing effect on the *Summers* exception.

For all of these reasons, the Court finds that the principles animating the *Summers* exception and the relevant case law support the application of that exception in the present case. On that basis, the Court finds that the Task Force Officers acted reasonably in briefly detaining Defendant while executing their arrest warrant on his companion, Skinner-Torres, and that no violation of Defendant's Fourth Amendment rights occurred.

### 3.    Reasonableness of Defendant's Seizure More Generally

The Court finally turns to assessing, in the alternative, whether the officers' actions in seizing Defendant were reasonable under the Supreme Court's traditional balancing test. Weighing the important governmental interest in officer safety against the minimal intrusion on Defendant's Fourth Amendment interests in this case, and relying on relevant case law, the Court finds that the officers acted reasonably in seizing Defendant and thus did not violate his Fourth Amendment rights.

23

Under the Fourth Amendment, "reasonableness 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Watson*, 703 F.3d at 690 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Where a seizure is not supported by probable cause that the person has engaged in criminal conduct, courts must "balance[ ] the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests." *Buie,* 494 U.S. at 331. Such balancing is necessarily case-specific and "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Terry*, 392 U.S. at 21 ("[T]here is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails.") (internal quotations omitted).

The facts of this case underscore the powerful and legitimate government interest that supported Defendant's temporary detention: the interest in officer safety. *Accord Watson*, 704 F.3d at 693 ("We do not question the proposition" that officer safety constitutes an "important law enforcement goal[]."). Here, law enforcement officers were arresting a known violent criminal on charges related to a violent crime. The officers reasonably believed, based on information provided to them, that Defendant, the suspect's companion, was possibly armed and dangerous. Based on the nature of the charges against Skinner-Torres, the information that the officers possessed concerning his companion and the location of the arrest in "one of the most dangerous places" in Richmond, the officers reasonably perceived an acute danger to themselves and others nearby if the arrest were to go sideways. (Hr'g Tr. 9:7–8.) Given that danger, the Task Force Officers had a strong interest in gaining control of the scene before effectuating Skinner-Torres's arrest, lest they be shot at by either man.

24

On the other side of the ledger, the intrusion on Defendant's liberty remained minimal. Defendant's temporary detention before his arrest (the proper basis of which Defendant does not challenge) involved no use of force against him; he was merely given a verbal command to "get on the ground." (*Id.* 29:2.) Furthermore, the period during which Defendant was detained without reasonable suspicion lasted less than two minutes, before the officers discovered his gun and Detective Ledbetter-Clarkson recognized him as a convicted felon.[12] (*Id.* 19:16–20:11.) These discoveries provided probable cause for his arrest, but Defendant's detention would not have lasted much longer in the absence of such discoveries. Detective Ledbetter-Clarkson credibly testified that she was planning to let him go shortly after his brief detention, had it not been for his illegally-possessed gun. (*Id.* 19:19–25.) For the same reasons, Defendant's detention also would not have involved "the inconvenience nor the indignity associated with a compelled visit to the police station," had he not been subsequently arrested. *Summers*, 452 U.S. at 702. While his seizure occurred in a public area, the Court notes the officers' deliberate decision to wait until Defendant and Skinner-Torres were alone in an alleyway, "so there were no others around." (Hr'g Tr. 14:12.) And though one officer appears to have placed his hand on Defendant's back and Detective Ledbetter-Clarkson asked Defendant for his ID, (Def. Ex. 1 at 00:40–00:45), Defendant was not otherwise touched, searched or interrogated in any manner. Based on all of these facts, the Court concludes that Defendant's temporary detention constituted only a *de minimis* intrusion on his liberty interests and remains significantly outweighed by the important government interest in officer safety and the acute dangers facing officers while

---

[12]    While Detective Ledbetter-Clarkson's BWC footage does not capture the exact moment that Defendant was first ordered to the ground, the footage at the 00:10 mark shows officers still standing at a distance from Defendant and Skinner-Torres, suggesting that the two men had laid down on the ground only shortly before. (Def. Ex. 1 at 00:10.) Defendant was formally arrested less than one minute later. (*See* Def. Ex. 1 at 01:09 (handcuffs being placed on Defendant).)

executing their arrest warrant on Skinner-Torres. Thus, his detention stands objectively reasonable for Fourth Amendment purposes.

The Court's finding of reasonableness in the specific circumstances of this case gleans support from a host of decisions performing similar balancing inquiries under similar circumstances and finding temporary detentions — including seizures of bystanders during the execution of arrest warrants — reasonable for Fourth Amendment purposes. Two state court cases out of Massachusetts and Connecticut provide the closest analogues to the instant case and help elucidate the inherent reasonableness of the officers' actions in this matter.

The Massachusetts Appeals Court confronted an almost identical factual scenario in *Commonwealth v. Ramirez*, 93 N.E.3d 864 (Mass. App. Ct. 2018). There, police observed a man whom they sought to arrest on an active warrant for using a firearm in the commission of a violent felony walking down the street with a companion, Defendant Ramirez. *Id.* at 866. Police approached the two men, and a detective said to them, "Come here, I want to talk to you." *Id.* The subject of the arrest warrant complied, but Ramirez attempted to walk away. *Id.* The detective ordered him to come back, and he complied. *Id.* Police ultimately frisked Ramirez and found a firearm. *Id.*

In assessing the merits of Ramirez's motion to suppress, the court found Ramirez's seizure — which occurred when the detective specifically ordered him to come talk to him — reasonable for Fourth Amendment purposes. *Id.* at 868. The court reasoned that "an officer may temporarily freeze a scene for the limited time reasonably necessary to safely execute an arrest warrant for a person accused of using a firearm in the commission of a violent felony." *Id.* at 867. Framing the pertinent inquiry as "whether the degree of intrusion [was] reasonable in the circumstances," the court weighed what it termed "the minimal intrusion upon an individual's

freedom for the brief period it would take for an officer to take control of the scene and effectuate an arrest" against the "special dangers encountered by an arresting officer when executing an arrest warrant for a crime that gives rise to a reasonable fear for officer safety." *Id.* (cleaned up). In weighing the facts at hand, the Court found that the balance weighed in favor of finding the officer's actions reasonable. *Id.* at 868–69.

The facts of *Ramirez* could hardly be more analogous to the instant case. Here, too, Defendant was walking with a subject wanted for arrest. Here, too, officers sought, through a verbal command, and without the use of any force, to secure Defendant, the arrestee's companion. As the *Ramirez* court found on the facts in that case, the intrusion of such a brief seizure that serves purely "to effectuate an arrest" is decidedly minimal compared to the risk of harm that an officer would reasonably perceive when executing an arrest warrant for a violent crime, militating in favor of a finding of reasonableness. *Id.* at 867. The facts of the instant case provide no meaningful basis for a different conclusion.

In *State v. Kelly*, 95 A.3d 1081 (Conn. 2014), the Connecticut Supreme Court considered an almost identical set of facts. There, defendant Kelly was walking on a public street with an individual whom the police sought to arrest on a warrant, and whom officers believed to be in possession of a firearm. *Id.* at 1085. Police ordered the men to "stop, stop, come here," but the men fled. *Id.* at 1086.

In assessing the Fourth Amendment reasonableness standard[13] as it related to the initial seizure of Kelly — the police's order to "stop" and "come here" — the Connecticut Supreme

---

[13]    While the question presented to the Connecticut Supreme Court concerned a state constitutional provision relating to unreasonable searches and seizures, the court noted that, "[b]ecause reasonableness is the touchstone of both the [F]ourth [A]mendment and" the relevant state constitutional provision, "persuasive federal precedent applying that standard is particularly relevant" to the Court's inquiry. *Kelly*, 95 A.3d at 1091. The Court subsequently engaged in an

Court found that, "for purposes of the reasonableness requirement of the [F]ourth [A]mendment, the state's interest in officer safety is sufficiently compelling that, when officers have a reasonable concern for their safety while lawfully detaining a suspect, it is permissible for the officers to briefly detain the suspect's companion as a precautionary measure." *Id.* at 1094. In discussing the risks faced by officers, the court emphasized that when officers seek to detain criminal suspects, they "may well encounter one or more persons accompanying the suspect," and that these companions "both increase[] the possibility of interference with the officer's investigation and . . . multipl[y] the sources of potential harm to the officer." *Id.* at 1095. On the other side of the ledger, the court emphasized that a "protective stop of the kind that occurred here" would "typically . . . be of short duration" and "ordinarily" would not require even an "accompanying patdown for weapons." On this basis, along with additional considerations in support of its findings,[14] the court found the officers' attempt to temporarily seize Kelly reasonable.

The Court again notes the unmistakable parallels between *Kelly* and the instant case: the defendant walking with the subject of an arrest warrant, the police officers' reasonable perception of potential danger (given the belief that at least one of the men was armed) and the verbal-only nature of the seizure, which was likely to remain brief and limited to the time required to arrest the defendant's companion. Most strikingly, the Connecticut court emphasized that the presence of companions during the arrest of a criminal suspect heightens the general risk

---

extensive discussion of federal Fourth Amendment jurisprudence and relied largely on this "persuasive federal precedent" in arriving at its finding of reasonableness in the case at bar. *Id.* at 1091–94.

[14]    Notably, the Connecticut Supreme Court also invoked *Summers* and the passenger vehicle rule in support of its reasonableness finding. *See Kelly*, 95 A.3d at 1096 (citing *Summers*, 548 U.S. at 258; *Brendlin v. California*, 551 U.S. 249, 257 (2007)).

of interference and harm to officers, a finding which it weighed against the de minimis nature of the intrusion posed by the temporary detention, given the detention's short duration and limited physical involvement with the companion of the suspect. As already discussed, these considerations, and the *Kelly* court's finding that the seizure of the companion was reasonable under the Fourth Amendment, apply with equal force in the instant case.

This Court also takes note of several other cases where courts considered similar facts and arrived at similar results, all of which further support the Court's conclusion that the law enforcement interests in this case sufficiently outweigh the intrusion on Defendant's liberty interests to render his seizure reasonable for Fourth Amendment purposes. In *Trice v. United States*, 849 A.2d 1002 (D.C. 2004), police were looking for a suspect in a stabbing when they encountered two men walking down the street, one of whom fit the suspect's description. *Id.* at 1004. The officers ordered both men, including the companion of the suspect, to stop and put their hands on the police car. *Id.* The District of Columbia Court of Appeals found that "immediate safety concerns, so long as they are reasonable under the circumstances, will justify the police in stopping . . . the companion of a person whom the police have reason to seize, even if the police have no particularized suspicion that the companion is armed, dangerous, or engaged in criminal activity." *Id.* at 1007. The court based this conclusion in part on its finding that, when confronting the suspect, the officers "could not avoid confronting Trice as well," who, considering the facts at hand, "might have tried to help [the suspect] resist arrest or retaliate against the officer." *Id.* at 1008. Meanwhile, in *United States v. Lewis,* 674 F.3d 1298 (11th Cir. 2012), the Eleventh Circuit considered the reasonableness of police officers ordering four men to the ground, when the officers possessed incriminating information on only two of them. Defendant Lewis, one of the two men for whom police lacked particularized suspicion of

29

criminal activity, had moved for suppression of evidence subsequently recovered from his

person. *Id.* at 1301. The Eleventh Circuit reversed the district court's grant of his suppression

motion, finding no Fourth Amendment violation where the police reasonably sought "to control

the movements of nearby associates and exercise command over the situation once the officers

had reasonable suspicion of criminal activity that warranted further investigation." *Id.* at 1308.[15]

These cases underscore the widespread recognition by courts all over the country that the brief

detention of companions or bystanders during the arrest of suspected criminals, even without

particularized suspicion, is inherently reasonable where the circumstances create a heightened

risk of danger to law enforcement officers on the scene.

Finally, the Supreme Court's opinion in *Maryland v. Wilson*, 519 U.S. 408 (1997), where

the Court held that officers may reasonably order passengers to exit a vehicle during a traffic

stop, even where the police do not possess an articulable reason to detain those passengers, lends

further support to the reasonableness of Defendant's detention in the instant case. The Court

rationalized this categorical rule by employing the same balancing test discussed above. *Id.* at

413–14. On the one hand, the Court emphasized the "legitimate and weighty" need for officer

safety. *Id.* at 412–13. The Court further assessed that the "danger to an officer from a traffic

stop is likely to be greater when there are passengers in addition to the driver in the stopped car,"

and that the "motivation of a passenger to employ violence to prevent apprehension of [a serious]

---

[15]      *See also Muehler*, 544 U.S, at 99–100 (finding that the use of handcuffs to detain a
bystander during the execution of a search warrant was reasonable, "because the governmental
interests outweigh the marginal intrusion" in an "inherently dangerous situation[]" and because
handcuffs "minimize[] the risk of harm to both officers and occupants."); *Enslin*, 327 F.3d at 796
(finding that the "substantial and important interest in preserving officer safety" while "searching
an unfamiliar residence for a fugitive," when contrasted with the "minimal" intrusion on the
defendant's privacy, suggests that the "balance affirmatively favors the Government's interest in
officer safety").

crime is every bit as great as that of the driver." *Id.* at 414. Although the Court conceded that "there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out," it rationalized the "additional intrusion" to the passengers as "minimal," in part because the passengers "are already stopped by virtue of the stop of the vehicle." *Id.* at 414–15. While the final point does not apply in the instant factual scenario, the central thrust of *Wilson* applies with equal force to the facts at hand: the presence of a companion during a reasonable stop of a wanted suspect heightens, rather than diminishes, the danger to law enforcement. The Supreme Court's recognition of the need to protect officers in such situations — even at the expense of a minor intrusion on an innocent companion's liberties — directly supports this Court's conclusion in the instant matter.[16]

---

[16]    The Court also notes the existence of the so-called "Automatic Companion Rule," which categorically grants police a limited right to pat down all nearby companions of a criminal arrestee, and which further supports the Court's finding of reasonableness in the instant case. *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971). As the Ninth Circuit explained:

> "*Terry* recognizes and common sense dictates that the legality of . . . a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."

*Id.* at 1193.
      The Fourth Circuit expressly endorsed the Automatic Companion Rule in *United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973) (per curiam), where it held that '[a]ll companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed.'" *Id.* (quoting *Berryhill*, 445 F.2d at 1193). While it is unclear whether the Automatic Companion Rule remains good law in the Fourth Circuit, given that the rule's logic appears to run contrary to the thrust of *Ybarra v. Illinois*, 444 U.S. at 91 (holding that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause [or reasonable suspicion] to

* * *

Nearly sixty years ago, the Supreme Court noted, in *Terry v. Ohio*, that "every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry*, 392 U.S. at 23. This disheartening picture has not changed in the intervening decades. While the Fourth Amendment protects the public from intrusions into its private affairs, that protection necessarily yields to the reasonable actions of reasonable police officers trying to do their jobs under difficult circumstances, and in the face of the real and present dangers that confront them every day. Law enforcement officers effectuating a valid judicial arrest warrant for a violent crime in a dangerous area, who encounter a potentially dangerous suspect and his potentially dangerous companion and, in order to take control of the situation, briefly detain that companion, fall within that very category. Both this Court and the Fourth Amendment recognize the need to ensure their safety.

For all of these reasons, the Court finds that the facts in this case support its conclusion that the powerful interest to protect officer safety sufficiently outweighs the brief intrusion on Defendant's liberties stemming from his brief detention during the arrest of his companion, which renders his seizure reasonable under the Fourth Amendment. On this basis, the Court finds that Defendant's Motion lacks merit and will DENY the Motion accordingly.

---

search that person"), the Court notes that a district court in the Fourth Circuit recently cited *Poms* and the Automatic Companion Rule in support of a finding that the warrantless search of an arrestee's companion for weapons was "proper for officer safety and public safety purposes," suggesting the rule's continued viability. *United States v. Cooper*, 2018 WL 3458629, at *2 (D.S.C. 2018).

### III.    CONCLUSION

For the aforementioned reasons, the Court finds that the Task Force Officers did not violate Defendant's Fourth Amendment rights when they briefly detained him on October 9, 2024 while executing an arrest warrant against his companion.  Accordingly, the Court will DENY Defendant's Motion to Suppress.  (ECF No. 15.)

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Alexandria, Virginia
Date:  September 22, 2025

33